Case No. 23-11458-E

UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

CHARBEL CONSUL,

     Appellant,

v.

PROGRESSIVE          AMERICAN
INSURANCE COMPANY,

     Appellee.

_____/

## INITIAL BRIEF OF APPELLANT CHARBEL CONSUL

On appeal from the United States District Court
Middle District of Florida

Waylon Thompson, Esq.
MANUEL & THOMPSON, P.A.
P.O. Box 1470
Panama City, FL 32402
      and
BURLINGTON & ROCKENBACH, P.A.
Courthouse Commons/Suite 350
444 West Railroad Avenue
West Palm Beach, FL 33401
(561) 721-0400
pmb@FLAppellateLaw.com
ajr@FLAppellateLaw.com
kbt@FLAppellateLaw.com
Attorneys for Appellant

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Appellant Charbel Consul, pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rules 26.1-1, 26.1-2, and 26.1-3, hereby submits this Certificate of Interested Persons and Corporate Disclosure Statement.

## <u>Interested Persons</u>

Bigman, Jeffrey E., Esq. – Trial counsel for Consul in underlying state court case

Burlington, Philip, Esq. – Appellate counsel for Appellant

Burlington & Rockenbach, P.A – Appellate counsel for Appellant

Choisser, William – Plaintiff in underlying state court case

Consul, Charbel – Plaintiff-Appellant

Corrigan, Timothy – District Judge, Middle District of Florida

Drive Insurance Holdings, Inc. – Parent corporation of Appellee

Kissane, Joseph, Esq. – Trial counsel for Appellee

Manuel & Thompson, P.A. – Trial counsel for Appellant

Posgay, Matthew, Esq. – Trial counsel for Choisser, plaintiff in underlying state court case

Progressive American Ins. Co. – Defendant-Appellee

Progressive Corp. (PGR) – Parent corporation of Drive Insurance Holdings

Richardson, Adam, Esq. – Appellate counsel for Appellant

Thompson, Waylon, Esq. – Trial counsel for Appellant

## **Corporate Disclosure**

Appellee Progressive American Insurance Company is a wholly owned subsidiary of Drive Insurance Holdings, Inc., which is a wholly owned subsidiary of Progressive Corp., which is a publicly traded company with the stock ticker "PGR."

## STATEMENT REGARDING ORAL ARGUMENT

Appellant desires oral argument. He believes that oral argument would benefit the Court because this is an insurance bad-faith case, which are highly dependent on their facts. Appellant believes that oral argument would help the Court explore and clarify the facts of the case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...................................................................1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS............................................................................... ii

TABLE OF AUTHORITIES ........................................................................ iv

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES...................................................................2

STATEMENT OF THE CASE......................................................................3

STATEMENT OF THE FACTS ....................................................................6

    A.    Background. ...........................................................................6

    B.    Accident and initial adjustment of the claims. ......................6

    C.    Posgay's offer to settle. .......................................................10

    D.    Progressive's evaluation of the offer....................................11

    E.    Progressive's counteroffer...................................................13

    F.    Posgay's attempt to clarify..................................................15

    G.    Progressive's insistence on the counteroffer terms and Posgay's rejection of the counteroffer. ...............................16

    H.    Progressive's failure to make any further attempts to settle. ..............18

    I.    Choisser files the underlying lawsuit. .................................21

    J.    Consul's expert testimony...................................................22

STANDARD OF REVIEW .........................................................................25

SUMMARY OF THE ARGUMENT ....................................................26

ARGUMENT ...........................................................................29

POINT I...............................................................................29

    THE DISTRICT COURT ERRED WHEN IT
    GRANTED SUMMARY JUDGMENT FOR
    PROGRESSIVE BECAUSE A REASONABLE JURY
    COULD FIND THAT PROGRESSIVE ACTED IN
    BAD FAITH UNDER THE TOTALITY OF THE
    CIRCUMSTANCES. ........................................................29

    A.    Florida's bad-faith standard. ...............................29

    B.    In its handling of the potential consortium claim,
          Progressive did not work on Consul's behalf to avoid an
          excess judgment. ................................................31

    C.    In its handling of the property-damage claim, Progressive
          did not work on Consul's behalf to avoid an excess
          judgment. ...........................................................34

    D.    Other facts supporting a finding of bad faith. .....................36

POINT II ..............................................................................39

    THE DISTRICT COURT ERRED WHEN IT
    GRANTED SUMMARY JUDGMENT FOR
    PROGRESSIVE BECAUSE A REASONABLE JURY
    COULD FIND THAT PROGRESSIVE'S BAD FAITH
    CAUSED THE EXCESS JUDGMENT TO BE
    ENTERED AGAINST CONSUL. .........................................39

CONCLUSION......................................................................43

CERTIFICATE OF COMPLIANCE WITH RULE 32(g) .....................44

CERTIFICATE OF SERVICE ...................................................45

SERVICE LIST......................................................................46

# TABLE OF AUTHORITIES

## Cases

*Am. Builders Ins. v. Southern-Owners Ins.*,
   56 F.4th 938 (11th Cir. 2023) .............................................................32

*Berges v. Infinity Ins. Co.*,
   896 So. 2d 665 (Fla. 2004)..................................................................30

*Boston Old Colony Ins. Co. v. Gutierrez*,
   386 So. 2d 783 (Fla. 1980)................................................ 29–30, 36–37

*Davis v. Strople*,
   29 So. 2d 364 (Fla. 1947) (Buford, J., dissenting).............................36

*Deary v. Progressive Am. Ins. Co.*,
   No. 21-11878, 2022 WL 2916358 (11th Cir. July 25, 2022) .............40

*Eres v. Progressive Am. Ins. Co.*,
   998 F.3d 1273 (11th Cir. 2021) .........................................................33

*Harvey v. GEICO Gen. Ins. Co.*,
   259 So. 3d 1 (Fla. 2018)..................................... 29–30, 33–34, 37–39

*Ilias v. USAA Gen. Indem. Co.*,
   61 F.4th 1338 (11th Cir. 2023) .........................................................32

*Jones v. UPS Ground Freight*,
   683 F.3d 1283 (11th Cir. 2012) .........................................................25

*McKinney v. Fortune Ins. Co.*,
   949 So. 2d 225 (Fla. 3d DCA 2006) ............................... 27, 30, 34–35

*Pelaez v. Gov't Employees Ins. Co.*,
   13 F.4th 1243 (11th Cir. 2021) ..................................................... 32, 39

*Powell v. Prudential Prop. & Cas. Ins. Co.*,
   584 So. 2d 12 (Fla. 3d DCA 1991) ................................... 28, 40, 42

*Yarbrough v. Decatur Hous. Auth.*,
 941 F.3d 1022 (11th Cir. 2019) ..............................................................25

**Statutes**

28 U.S.C. § 1291 ...........................................................................................1
28 U.S.C. § 1332 ...........................................................................................1
Fla. Stat. § 319.30 ............................................................................. 27, 34–35

**Rules**

Fed. R. App. P. 26.1 .....................................................................................1
Fed. R. App. P. 32(a)(7)(B)(i) ...................................................................44
Fed. R. Civ. P. 56(a) ..................................................................................25

# <u>JURISDICTIONAL STATEMENT</u>

This is an appeal from a final order of the United States District Court for the Middle District of Florida that disposes of all the parties' claims.

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332 based on the complete diversity of citizenship of the parties.

The final order was entered on March 31, 2023. (DE 69.) Appellant timely filed the notice of appeal on April 27, 2023. (DE 74.) The Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

Whether a reasonable jury could find that Progressive American Insurance Company acted in bad faith toward its insured under the totality of the circumstances.

Whether a reasonable jury could find that Progressive American Insurance Company's bad faith caused the excess judgment to be entered against its insured.

## STATEMENT OF THE CASE

This is an appeal from a summary judgment in a third-party insurer bad faith case filed by an insured against his insurer.

Plaintiff Charbel Consul, the insured, filed a complaint for bad faith against his insurer, Progressive American Insurance Company, in the United States District Court for the Middle District of Florida following entry of an excess judgment against him in a personal-injury action in Florida state court arising from a car accident. (DE 2; DE 33-1.)

Progressive filed an answer and affirmative defenses denying the substance of Consul's allegations. (DE 7.)

Progressive filed a motion for summary judgment arguing that it did not act in bad faith and, if it had, the bad faith did not cause the excess judgment against Consul. (DE 33.) Specifically, Progressive argued that 1) the claimant, William Choisser, never made a valid offer to Progressive to settle; 2) it did everything it could to resolve a consortium claim that potentially could have been brought by Choisser's wife; and 3) Choisser refused to comply with a Florida statute that, in Progressive's view, required it to obtain from Choisser title to his car for the insurer to process with the state.

In response, Consul argued that 1) Progressive's focus on the terms of Choisser's offer was misplaced because Florida law is clear that the claimant does

not have to make an offer to the insurance company for there to be bad faith; 2) Progressive did not work on Consul's behalf to avoid an excess judgment when it came to its inexplicable handling of the potential consortium claim; and 3) with regard to the title, Progressive insisted that Choisser do something—hand over title—that was not required by the relevant state statute. (DE 44.) Progressive filed a reply. (DE 55.)

The district court held a lengthy hearing on Progressive's motion. (DE 63.) At the end of the hearing, the court asked the parties to submit supplemental memoranda on causation and any other issues they wanted to discuss.

In its memorandum, Progressive discussed causation, arguing that the court could not consider any conduct after December 13, 2016 (the date of a certain letter sent to Progressive by Choisser's attorney, Matthew Posgay), in determining whether any actions or inaction of Progressive could have been the cause of the excess judgment. (DE 62.) In his memorandum, Consul argued that the court could and that there was a genuine dispute over causation, specifically, over whether the case could have settled after December 13. (DE 66.) Consul also explained at length what "bad faith" means under Florida law—i.e., it is a term of art—and argued that the totality of the circumstances showed that Progressive acted in bad faith.

The court ultimately entered an order granting summary judgment. (DE68.)

The court concluded that 1) Progressive could still have acted in bad faith even if Choisser did not make an offer to settle, thus agreeing with Consul. However, the court also concluded that 2) Progressive did not mishandle the consortium claim; 3) Progressive did not mishandle the title issue; 4) Progressive did not act unreasonably in communicating with Christopher Campione, Consul's attorney in his own personal-injury lawsuit arising from the accident, rather than directly with Consul, and there was no genuine dispute that Progressive mailed Consul an excess letter; and 5) because Posgay testified in his deposition in this case that he would not have settled within Consul's policy limits after his December 13 letter, there was no possibility of settlement and Progressive's failure to continue settlement negotiations after that date did not cause the excess judgment.

Consul timely appealed. (DE 74.)

## STATEMENT OF THE FACTS

**A. Background.**

Progressive issued an automobile insurance policy to Consul. The coverages were $10,000 per person for bodily injury and, for property, $10,000 per accident—i.e., minimal limits.

William Choisser, the eventual claimant and personal-injury plaintiff, was both an attorney and a practicing medical doctor. (DE 38-1 at 5.) He was married to his second wife, Dana Marie Merritt. (*Id.* at 22.)

His car was a diesel 1991 Mercedes 300D. (*Id.* at 14, 17.) Choisser explained that this model "was one of the last hand-crafted Mercedes. All the other ones are subsequently just mechanized. In that way it was classic. And it was just barely broken in." (*Id.* at 14–15.) He purchased the car a few years before the accident based on a friendly contract and the purchase price was $3,000. (*Id.* at 16–17.) The car had 165,000 miles at the time of the accident, but it was in perfect condition. (DE 33-2 at 142; DE 38-1 at 20–21.) He put money into the car after the purchase. (DE 39-1 at 50.)

**B. Accident and initial adjustment of the claims.**

The accident was on September 6, 2016. (DE 38-1 at 14.) Consul rear-ended Choisser. (DE 33-2 at 154; DE 45-1 at 20, 22.) In deposition, Choisser testified that he was significantly injured as a result of the accident. (DE 38-1 at 28.)

Choisser's car was significantly damaged, not drivable, and was towed away. (DE 35-1 at 13, 19; DE 45-1 at 16, 35–36; DE 38-1 at 21.) Choisser had said it was going to the junkyard, indicating it could not be fixed. (DE 35-1 at 14.) Choisser reported the accident to Progressive. (DE 33-2 at 154.)

A few days after the accident, on September 9, Progressive assigned Diane Forst to handle Choisser's bodily-injury claim. In addition, Forst was the "file owner," which meant she was responsible for ensuring all claims arising from the accident were handled properly. (*See* DE 45-1 at 14–15.) Forst's supervisor was Billy Mixson. (DE 36-1 at 10, 45–46.)

The first day she had the claim, Forst knew that there was a potential for excess exposure to Consul. (DE 36-1 at 43.) In her deposition, she claimed she mailed Consul an excess letter that day and was able to speak to him later that day. (DE 36-1 at 43–44, 47–49; *see also* DE 33-14; DE 33-2 at 144–45.) However, and despite the district court's contrary conclusion (DE 68 at 16–17), there was evidence from which a jury could conclude that Progressive did not send the letter to Consul. Specifically, Keith Pelkey, a Progressive adjuster who was later assigned the claim, admitted, based on his review of Progressive's electronic file, that there was no evidence that Progressive sent Consul an excess letter. (DE 46-1 at 37–38.) In fact, as Pelkey admitted in his deposition, he marked "no" in the electronic system at the prompt, "Excess letter sent by claims?" (*Id.* at 34.)

Forst called and spoke with Choisser's attorney, Matthew Posgay. (DE 33-2 at 147.) He explained to Forst the circumstances of the accident and Choisser's injuries. (*Id.*) Forst asked Posgay for Choisser's wife's name. (*Id.*) He said "his client's" claim warranted tender of the policy limits and did not know why Forst needed the wife's information at this time. (*Id.*) She explained the wife's name would have to be on a release to cover any consortium claim. (*Id.*) Posgay repeated what he said. (*Id.*) Forst claimed she tried unsuccessfully to contact Posgay to get information on a potential consortium claim. (DE 36-1 at 199.)

Progressive had earlier assigned Melissa Wolfe to handle the property-damage claim; she assisted Forst with the liability investigation. (DE 33-2 at 154; DE 45-1 at 24.) On September 9, she interviewed Consul. (DE 33-2 at 145; DE 45-1 at 34.) Wolfe determined that Consul was 100% at fault for the accident, assigning 0% to Choisser. (DE 36-1 at 81; DE 33-2 at 144; DE 45-1 at 20.)

It is worth noting at this point that Progressive's employees did not like Posgay. In a September 15 claim note, Wolfe wrote: "HE'S NOT BEING PLEASANT TOWARDS ME WHAT SO EVER AND IT HAS BEEN LIKE THIS SINCE DAY 1." (DE 33-2 at 139.) Furthermore, Forst testified that she "[t]alked to [Posgay] one time on the initial call where he was very unprofessional and wouldn't provide basic information that was easily accessible." (DE 36-1.)

By letter to Forst dated September 12, Posgay put Progressive on notice that he represented Choisser. (DE 33-3.) As Forst conceded in deposition, there was no mention of Choisser's wife in the letter, or any indication that Posgay represented Choisser's wife. (DE 36-1 at 93–94.)

On September 14, Progressive employee Michael Dougherty completed a search of the Florida DMV. (DE 33-5 at 2.) He determined that the vehicle was a total loss (Posgay never agreed to this) and that the cost to repair the car exceeded 100% of the replacement cost (there is no evidence of how he reached this conclusion). (DE 33-5 at 2; DE 33-2 at 142.) A survey of allegedly comparable sales within the relevant geographic area placed the market value of the car at $2,258.42. (DE 33-5 at 2; DE 33-4.) Dougherty approved that figure for a "total loss settlement." (DE 33-2 at 142.) None of those cars was a diesel, however. (*See* DE 33-4 at 3.)

Wolfe and Posgay spoke, and he requested $2,000 more. (DE 33-2 at 139; DE 33-5 at 3.) Dougherty called Posgay to explain how Progressive arrived at its figure. (DE 33-2 at 138–39.) Dougherty said that Posgay "would need addl supports to justify an increase." (*Id.* at 138.) Posgay referred to Kelley Blue Book and NADA guides, which Dougherty was not interested in. (*Id.*) Dougherty told Posgay that he could provide his own comparable sales, but Posgay said he would not. (*Id.*)

On September 28, attorney Christopher Campione sent a letter to Progressive advising Progressive that he "represent[ed] [Consul] in regard to injuries sustained in the above-referenced accident." (DE 33-7.) Campione represented Consul in a UM claim and to make sure that PIP benefits were paid. (DE 34-1 at 9; DE 41-1 at 28–29, 100–01.) He never said he represented Consul in defense against the Choisser claims. (DE 34-1 at 16.) And in fact, Consul, who had no experience in the insurance business, testified that he relied on Progressive to handle the claims and to respond to any settlement offers. (DE 34-1 at 98–99.)

On October 10, Forst received the police report and determined that Consul was 100% at fault, and Choisser 0%. (DE 33-2 at 131.)

### C. Posgay's offer to settle.

On October 17, Posgay sent a letter to Forst offering to settle both claims against Consul. (DE 33-6.) In relevant part, the letter stated:

> We have enclosed with this letter a copy of the lumbar MRI report and records from Dr. Spatola. As you will note, my client has been diagnosed with protruding discs at L2–3, L3–4, L4–5 and L5–S1. He has also been diagnosed with annular tears at L4–5 and L5–S1. The most troubling aspect of the MRI report is that Dr. Choisser's nerve roots are being impacted at the L4–5 and L5–S1 levels. These are significant injuries and he was never diagnosed with these permanent problems prior to the subject crash. Dr. Spatola, a neurosurgeon, has also indicated our client may need surgery due to the spinal injuries sustained at the C4–5 and C5–6 levels. Even if an argument was made that Dr. Choisser had pre-existing degenerative changes in his cervical and lumbar spines, it is clear he sustained a significant, permanent aggravation to any alleged pre-existing condition, due to the clear negligence of your insured.

> Based upon the information you have provided to me, your insured …
> only had $10,000.00 per person in bodily injury liability coverage and
> only $10,000.00 available in property damage coverage…. Despite
> these minimal limits … , my client does want to amicably resolve all
> claims that he could raise against Mr. Consul…. Therefore, my client
> makes the following offer … : payment of the $5,000.00 to Dr.
> Choisser for the property damage … , payment of the $10,000.00 bod-
> ily injury liability limits … for the personal injuries … , completion of
> the enclosed financial affidavit by Mr. Consul and returned to me with
> my client being satisfied that Mr. Consul does not have the ability to
> pay anything out of his own pocket for the personal injuries sustained
> by my client…. Further, if you do request a release be signed by my
> client in favor of Mr. Consul, then only Mr. Consul will be released,
> while the release will not contain any defense, hold harmless or in-
> demnity language…. The $10,000.00 check for personal injuries will
> be returned to you if my client is not satisfied that Mr. Consul does
> not have the ability to pay money out of his own pocket….

Posgay demanded payment within thirty days.

### D. Progressive's evaluation of the offer.

Forst testified, "I knew at that point, when I reviewed this letter and the
medical records included, that I was going to pay the policy limit of $10,000 for
the bodily injury claim." (DE 36-1 at 120.) However, Forst was not handling the
property-damage claim. (*Id.*) Forst interpreted "all claims" to mean, also, any de-
rivative claim that Choisser's wife had. (*Id.* at 104, 110, 117.)

On October 25, Forst called attorney Campione, whom she assumed to be
Consul's attorney for defense of the bodily-injury claim, which was directly con-
trary to Campione's September 28 letter. (DE 33-2 at 127, 185–86.) It is, in fact,
directly contrary to Forst's own note about the call: "He is representing [Consul]

11

for his injury claim." (*Id.* at 127.) Campione testified that Forst asked him to help get the affidavit completed because Progressive was having trouble reaching Consul; Campione may have asked for the letter but that is not clear. (DE 34-1 at 29, 63–64, 81, 136, 140, 143.)

Because in her mind Consul was represented by a defense attorney, Forst would speak only with the attorney. (DE 36-1 at 69–70.) There is no indication that Progressive communicated directly with Consul regarding settlement of Choisser's claims. (DE 34-1 at 29; *see also id.* at 53, 58, 80–81.)

Campione could not confirm in his deposition that he received a copy of the October 17 letter. (*Id.* at 36–37, 43, 58, 159–61.)

He did receive the affidavit and assisted Consul in completing it; it showed basically no assets. (DE 36-1 at 109, 213; DE 33-9; DE 34-1 at 42.) Although in the district court Progressive pointed to defects in the affidavit (DE 33 at 7–8), there is no mention in the claims notes that Progressive recognized there were defects, and Posgay never indicated to Forst that the affidavit was not acceptable (DE 36-1 at 109, 122; DE 37-1 at 54, 131).

On November 11, Forst and Mixson reviewed the settlement offer. (DE 33-2 at 125; DE 36-1 at 130.) They decided to tender the $5,000 for the property-damage claim and the $10,000 for the bodily-injury claim. (DE 33-2 at 125.)

On November 15, Forst called Posgay's office. (*Id.* at 121–22.) She left a message that, inter alia, asked for Choisser's wife's name for the release.

Forst had no independent recollection of whether she and Mixson discussed the potential for a consortium claim. (DE 36-1 at 131.) She testified that she knew Posgay was not Choisser's wife's attorney. (*Id.* at 123.) But Forst said Posgay was Choisser's attorney and, she assumed, Choisser lived with his wife; so at least in Forst's mind, the burden was really on them to ask Choisser's wife about and resolve the consortium issue. (*See id.* at 122–23, 136, 170.) Forst conducted an investigation to identify and locate Choisser's wife that, as shown below, turned up the wrong name. (*Id.* at 141–43.) She never attempted to contact Choisser's wife to determine if she was making a consortium claim. (*Id.* at 143; DE 35-1 at 23.)

### E. Progressive's counteroffer.

On November 15, Forst sent a letter to Posgay identifying "YOUR CLIENT" as "Dr. William Choisser." (DE 33-10.) The letter read in part:

> Progressive has agreed to pay Ten Thousand Dollars and No Cents as full and final settlement for your client's claim for injuries and Five Thousand Dollars and No Cents as full and final settlement for you client's claim for his property damage sustained in the above-captioned accident.
>
> Enclosed please find our drafts in the amounts of $10,000.00 and $5,000.00. It is requested that these drafts be held in trust until such time that the enclosed proposed release is completed by your client and returned to this office along with his completed title.
>
> ….

In reference to our proposed release, I have made several attempts to secure your client's wife's name for the release, but have been unsuccessful. Our investigation shows that Dr. Choisser's wife's name is Mary and we have added her, as such. If this is not correct, please advise me at your earliest convenience so we can change it, accordingly. Should the language on the drafts or proposed release not meet your specifications, please call me immediately … to discuss.

The Florida title completion instructions are enclosed in order to aid your client. Please have the original completed title returned to us within 14 days so we may process your client's total loss claim.

The check for the BI limit was dated November 15, 2016, and stated: "VOID IF NOT PRESENTED WITHIN 90 DAYS." (DE 33-10 at 3.) Posgay never cashed the check.

The proposed release included "Mary Choisser." (DE 33-10 at 2.) "Mary" was Choisser's first wife, Mary Hoffman; they divorced in 2000. (DE 38-1 at 23.) As noted above, his current wife was Dana Marie Meritt. (DE 38-1 at 22.)

Forst did not contact Campione to discuss the contents of the letter before it went out. (DE 34-1 at 169–70.) Campione was not aware of any communication between Forst and Consul about the contents of the letter before it went out. (DE 34-1 at 170–71.)

Consul was not copied on the letter. Although the letter stated a copy was being sent to Campione, he could not confirm that he received it. (DE 34-1 at 71, 146.) In any event, Campione was not representing Consul as defense counsel, so

he would not be evaluating and overseeing settlement discussions regarding Choisser's claims. (DE 34-1 at 77–81.)

**F. Posgay's attempt to clarify.**

Posgay understood Progressive's letter to be a counteroffer because it did not mirror the terms of his offer. (DE 37-1 at 32, 42–43, 50.) Instead, it asked for a release of any consortium claim and for Choisser to give Progressive title to his vehicle. (*See, e.g.*, DE 37-1 at 146–47.)

On December 1, Posgay sent a letter to Forst that said, in relevant part:

I am in receipt of your November 15, 2016 letter and included documents, received by me on November 16, 2016. I do not represent Dr. Choisser's wife and I am writing to clarify whether you and your company are conditioning the $10,000.00 bodily injury policy limits tender on Dr. Choisser's wife being included in the release?

Additionally, the settlement offer presented to you and your company never stated nor implied that Dr. Choisser would surrender the title to his motor vehicle in exchange for the payment of $5,000.00 for the damage done to his vehicle. Is this really a condition you and your company are placing on my client for him to resolve his claim against your insured?

Please let me know whether these are actually two conditions that you and your company are placing on my client in order for him to accept the $10,000.00 bodily injury payment and the $5,000.00 property damage payment. If so, then I will need to have my client consider your and your company's counteroffer. I look forward to receiving a written response within 10 days from the date of this letter.

(DE 33-11.)

Posgay did not reject Progressive's counteroffer because of any claimed deficiencies in the affidavit. (DE 37-1 at 55, 132–33.) Even Forst and Mixson did not realize there were any deficiencies until just before their depositions.

Upon review of the above letter, Forst did not change the proposed release to omit Choisser's wife's name: "No, [Posgay] never contacted me requesting a release without her name stating she wasn't presenting a loss of consortium claim." (DE 36-1 at 144.) She said, "had he just answered the question, if there was no loss of consortium, we would have omitted her name from the release." (DE 36-1 at 154; *see also* DE 36-1 at 225, 230–31.) Forst did not follow up directly with Choisser's wife (DE 36-1 at 154–55), even though in the past she had sent letters directly to claimants' spouses (DE 36-1 at 156).

Forst also testified, wrongly, that Florida law required Choisser to transfer title to Progressive even if he wanted to retain salvage. (DE 36-1 at 146, 148, 157–60, 219–20.) The actual law is discussed in the argument section.

Forst testified that she sent a copy of the letter to Campione but provided no evidence to confirm that. (DE 36-1 at 149–54.) Campione testified that she did not ask him about the letter. (DE 34-1 at 176.)

### G. Progressive's insistence on the counteroffer terms and Posgay's rejection of the counteroffer.

On December 7, Forst sent Posgay a letter:

We include both parties on the release due to loss of consortium. If you do not wish for Dr. Choisser's wife's name to be on the release, we need a letter stating **you** will not be pursuing a loss of consortium claim **on her behalf**. We can then remove her name.[1]

Dr. Choisser's 1991 Mercedes Benz 300D was deemed [by Progressive] to be a total loss. Per Florida law, we need the title to process the total loss claim. Even if Dr. Choisser wishes to retain the salvage, we still need the title to process the title with the State of Florida for a certificate of destruction.

Please contact me if you have any questions or wish to discuss.

(DE 33-12 (emphasis added).)

Before sending this letter, Forst did not discuss it with Consul, or seek Campione's input. (DE 36-1 at 165–66, 175; DE 33-2 at 115; DE 34-1 at 177.) Campione testified that, if Progressive had asked whether to exclude any potential consortium claim from the release, he would have told Consul to do so. (DE 34-1 at 148–49.)

Consul was not copied on this letter. Although the December 7 letter stated a copy was being sent to Campione, he could not confirm that he received it. (DE 34-1 at 98–99, 146.)

Posgay understood the above letter as Progressive insisting on the terms of its counteroffer. (DE 37-1 at 48–49.)

On December 13, Posgay sent a response to Forst:

---

[1] A few days before her deposition, Forst came to the realization that, with regard to the wife, the letter was not worded properly. (DE 36-1 at 162–63.)

Thank you for your counter-offer, but it is respectfully declined. As was previously explained, ***I do not represent Mrs. Choisser and I cannot waive claims on her behalf***. More importantly, we do not believe that ***your determination*** that the cost of repair exceeds the value of the vehicle (making it a total loss) requires surrender of the vehicle title, if it is Dr. Choisser's desire ***to retain and repair*** the vehicle. We are thus unable to resolve the claim on the terms you propose, and you have declined to resolve the claim on the terms proposed by Dr. Choisser.

(DE 33-13 (emphasis added).)

However, Posgay never returned the checks to Progressive. (DE 37-1 at 59; *see also, e.g.*, DE 33-2 at 105–08.)

**H. Progressive's failure to make any further attempts to settle.**

Posgay acknowledged the language in the above letter and testified that this was the last date Progressive could have settled the claims within the policy limits. (DE 37-1 at 19–20.) However, Posgay never communicated to Progressive that the claims could no longer be resolved. Also, Dr. Choisser testified that he would have settled on his terms. (DE 38-1 at 81:4–10; DE 65.)

Forst reviewed the letter on December 20, according to the stamp. She believed "there was an impasse and the claims may not resolve." (DE 36-1 at 72; *see also* DE 36-1 at 210, 223.)

Yet she never contacted him to correct the improper wording in her December 7 letter. (DE 36-1 at 164.) Her excuse? "No I didn't, and he didn't pick up the phone and call me. And I had already made several—maybe five or more attempts

to reach him on other issues before this." (DE 36-1 at 164.) Forst also testified that she never sent a revised proposed release omitting Choisser's wife. (DE 36-1 at 164–65, 168–69, 184.) As for the property-damage claim, Forst understood that Posgay contested Progressive's unilateral determination that Choisser's car was a total loss. (DE 36-1 at 172–73.)

On December 20, Forst and Mixson reviewed the December 13 letter, determined no response was required, and decided to send a suit alert letter to Campione and call him. (DE 33-2 at 113.) Forst considered the tender rejected, at which point the claim was transferred to a different department, and she would monitor court records to see if a lawsuit was filed. (DE 36-1 at 169, 193.)

During Forst's December 20 call with Campione, she explained to Campione that the claims were not resolving and read Posgay's letter to him. (DE 33-2 at 113.) Campione told Forst that he was worried Progressive was exposing Consul's assets and mentioned bad faith. (DE 33-2 at 113.) That is, Campione put Progressive on notice that it could be acting in bad faith. Forst said that Progressive had met Choisser's demands but claimed that the state required the title to be processed regardless of who retained salvage. (DE 33-2 at 113; DE 36-1 at 118.) Forst testified that she sent the December 13 letter to Campione, but there was no confirmatory evidence that it actually was. (DE 36-1 at 174–77.)

In the course of monitoring court records, Forst discovered that Consul filed his own lawsuit as a plaintiff in which Campione represented him. (DE 36-1 at 194; DE 33-2 at 111.) Forst did not question her assumption about Campione's role, or whether she should contact Consul directly. (DE 36-1 at 177, 179, 194–95.) She said that Campione should have offered to assist Progressive in resolving the claims. (DE 36-1 at 183.)

There are indications in Progressive's own claim notes that it thought that both the property-damage claim and bodily-injury claim could settle, which is true even up until the entry of final judgment. On July 31, 2017, Forst wrote the following note stating that "BI SETTLEMENT STILL NOT ACCEPTED." (DE 33-2 at 100–01 (1:16 p.m.).) On December 5, 2017, a Progressive adjustor wrote that she left a message for Posgay and that she "WANT[ED] TO SEE WHAT CAN WE DO TO GET THIS CLAIM RESOLVED." (DE 33-2 at 93 (12-05-2017, 12:12 p.m.).) On December 15, 2017, another Progressive adjustor wrote that he called and left a message for Posgay and asked, "WHY ARE THEY NOT ACCEPTING OUR MONEY." (DE 33-2 at 91 (12:39 p.m.).) On January 10, 2018, that adjustor wrote that he again called a left a message with Posgay and asked: "WILL THEY TAKE OUR MONEY???" (DE 33-2 at 89–90 (2:12 p.m.); *see also, e.g.*, DE 33-2 at 90 (01-08-2018, 12:17 p.m.; 12-18-2017, 9:37 a.m.), 95 (12-01-2017, 10:48

a.m.), 99 (10-15-2017, 8:45 p.m.; 09-25-2017, 4:13 p.m.), 103 (07-13-2017, 4:05

p.m.), 104 (06-18-2017, 10:28 p.m.), 106–07 (04-05-2017, 12:21 a.m.).)

## I. Choisser files the underlying lawsuit.

Significantly, Choisser did not file the underlying personal-injury and prop-

erty-damage lawsuit against Consul until November 17, 2017—months after Pro-

gressive's questionable determination that the claims would not settle. (DE 36-1 at

174.)

Choisser was the only plaintiff. The wife never made a consortium claim.

(DE 35-1 at 15.) Based on her testimony, if she had been asked in the September–

November time period if she were going to press a consortium claim, it is likely

she would have said no. (DE 35-1 at 15–16, 19, 22.) However, when asked if she

would have been willing to sign a release waiving a consortium claim for the

amounts her husband demanded, Merritt said, "I have no idea. That never came

up." (DE 35-1 at 18.)

As evidence that Choisser's claims could settle, as a result of mediation in

January 2020, Progressive paid $7,500 to settle Choisser's property-damage claim,

and he surrendered title to Progressive, including salvage. (DE 33-2 at 34; DE 38-1

at 21–22, 49.) Choisser changed his mind on salvage because Progressive paid him

over $7,000. (DE 38-1 at 49.)

As further evidence that Progressive believed that Choisser's claims could settle, Consul, through his Progressive-provided attorney, filed a Motion to Compel Enforcement of Settlement in the underlying lawsuit, though the motion was denied. (DE 44-1; DE 44-2.) The argument was made again in direct appeal, which also was unsuccessful. (DE 44-3; DE 44-4.)

The case against Consul went to trial on the personal-injury claim and resulted in an excess judgment being entered against him. (DE 33-1.)

## J. Consul's expert testimony.

Consul retained attorney Michael Hook as his expert on bad faith. Hook testified that Progressive had multiple opportunities to settle the case through and even after December 2016. (DE 39-1 at 34–36.) Hook testified that, before mid-December, Progressive had two opportunities to settle Choisser's claims within Consul's policy limits—reflected in the October 17 and December 1 letters—and failed to do so, instead requiring and insisting upon additional conditions that constituted a counteroffer. (*Id.* at 38, 121–23; DE 40-1 at 32–33, 47–49.) Hook testified that Florida law does not even require that a claimant make a settlement offer to trigger the insurer's duty to settle. (DE 39-1 at 61–64.)

Hook testified that an insurer has a duty to keep its insured informed, which it failed to do. (*See id.* at 79, 85.) Hook testified that Campione was not Consul's defense attorney, but rather represented him in his own claim. (*Id.* at 81; DE 40-2

at 29.) Hook also noted that there were questions about whether Progressive ever sent Consul an excess letter (DE 39-1 at 92–93) and whether Progressive informed either Consul or Campione of the counteroffer and its conditions (*id.* at 82).

Regarding Progressive's attempts to obtain information from Posgay about Choisser's claims, Hook testified that it is not unusual for a claimant's lawyer to fail to respond to such attempts "[a]nd insurance companies and adjusters and claims managers know that." (*Id.* at 97–98.)

Hook testified that Progressive had sufficient medical records to justify offering the $10,000 bodily-injury policy limits even without a statement in the records that Choisser had a permanent injury, which is what Progressive did, and that Progressive never asked for additional records before making that tender. (*Id.* at 66–68, 73–75, 133–34.) However, Hook testified that it was improper to then make that tender with a new condition to release a claim that was not Choisser's to release, namely the consortium claim, that Progressive insisted on. (*Id.* at 67, 135–36; DE 40-1 at 14–22, 82–87.) Hook testified that Posgay did not represent Choisser's wife and was not required to. (DE 40-1 at 28, 40.)

As for Choisser's property-damage claim, while Progressive again focused on the valuation of Choisser's car, Hook made the common-sense observation that Progressive agreed to the $5,000. (DE 39-1 at 43–44, 104–09.) He also said that Posgay referred Progressive to the Kelley Blue Book and the NADA guides—two

sources insurers actually do consider—which Progressive did not follow up on. (DE 40-1 at 71–77; DE 40-2 at 36–37.) Further, Hook testified that, for a car to be a total loss, both sides—the insurer and the claimant—must agree, and Posgay did not. (DE 39-1 at 51, 112–13, 123; DE 40-1 at 59; DE 40-2 at 39.) Hook also disputed the idea that Florida law required the insurance company to submit the title to the state if it compensates for a car as a total loss if the claimant keeps the car. (DE 39-1 at 118–19; DE 40-1 at 48–50.)

Progressive challenged the admissibility of Hook's testimony via a *Daubert* motion. (DE 42.) Consul filed a response (DE 47) and Progressive filed a reply (DE 55). The district court did not reference Hook's testimony in the summary-judgment order and, instead, denied the *Daubert* motion as moot in the decretal section of the order. (DE 68 at 21.)

## STANDARD OF REVIEW

The Court reviews an order on a motion for summary judgment de novo. *Yarbrough v. Decatur Hous. Auth.*, 941 F.3d 1022, 1026 (11th Cir. 2019).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1291–92 (11th Cir. 2012). The court cannot weigh conflicting evidence or make credibility determinations. *Id.* at 1292. If there is a genuine dispute of material fact, the court must deny summary judgment and proceed to trial. *Id.*

## SUMMARY OF THE ARGUMENT

The district court erred when it granted summary judgment because there were genuine disputes of material fact on whether Progressive acted in bad faith and whether its bad faith caused the excess judgment to be entered against Consul.

**Point I:** A reasonable jury could find that Progressive acted in bad faith. The critical inquiry is whether Progressive diligently, and with the same haste and precision as if it were in the insured's shoes, worked on Consul's behalf to avoid the excess judgment. Progressive's conduct must be determined under the totality-of-the-circumstances standard. Evaluated against these standards, Progressive badly mishandled Choisser's claims.

Regarding the potential consortium claim, Progressive inexplicably insisted that Choisser release a claim that neither he nor Posgay could release. Obviously, Choisser could not release a claim that was not his. And as Posgay made clear to Progressive many times, he did not represent the wife. Yet Progressive did not revise its proposed, unreasonably overbroad release to omit the wife. Progressive also did virtually nothing to contact the wife. Had it done so, it would have learned that Choisser's wife had no interest in pursuing a claim. Then, aside from checking the court clerk's website to see if its insured was sued, Progressive did nothing to try to settle the claim between Posgay's December 13, 2016, letter and the filing of Choisser's lawsuit in November 2017.

As for the issue over title to Choisser's car, Progressive insisted that Choisser transfer title to the insurer because it wrongly believed it was legally required to submit the title to the state. Under Florida Statutes § 319.30, a vehicle is a total loss—and an insurer must send the certificate of title to the state—"when there is an agreement between the insurance company and the vehicle owner to replace the vehicle with one of like kind and quality." *McKinney v. Fortune Ins. Co.*, 949 So. 2d 225, 225 (Fla. 3d DCA 2006). But a vehicle is not a total loss when there is an agreement to repair. Choisser never agreed to replace his car and, in the December 13 letter, Posgay explicitly indicated that Choisser may want to repair his car. The car was not a total loss; Progressive was not required to submit the title to the state. Progressive's misunderstanding of the law was unreasonable, not a good-faith interpretation as the district court said. The statute says what it says, and if there was any doubt about what it meant, that doubt was cleared up by *McKinney* in 2006.

The above and other facts clearly establish that Progressive did not diligently, and with the same haste and precision as if it were in Consul's shoes, work on his behalf to avoid an excess judgment. The district court erred when it found, as a matter of law, that Progressive did not act in bad faith.

**Point II:** A reasonable jury could find that Progressive's bad faith caused the excess judgment to be entered against Consul. The district court erroneously

concluded that Progressive's failure to engage in settlement negotiations after Posgay's December 13 letter could not have caused the excess judgment because the insurer could not have settled within the policy limits after that date.

While Posgay did testify in his deposition in this case that Choisser's claims could not have settled within the policy limits after December 13, there was other evidence showing that the claims could have settled: the letter itself, which was open-ended and did not foreclosure settlement; Progressive's claim notes; the absence of evidence that Choisser, a sophisticated claimant, would simply have done what his attorney recommended; and Choisser's deposition testimony that he would have settled on his original terms. Posgay's testimony and the other evidence and testimony pointed in two different directions on whether the claims could have settled within the limits after December 13.

"Any question about the possible outcome of a settlement effort should be resolved in favor of the insured; the insurer has the burden to show ... that there was no realistic possibility of settlement within policy limits[.]" *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991) (citations omitted). Progressive failed to carry its burden; there was sufficient evidence of a realistic possibility of settlement. The district court accordingly erred when it held, as a matter of law, that Progressive's bad faith did not cause the excess judgment against its insured.

## ARGUMENT

## POINT I

THE DISTRICT COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT FOR PROGRESSIVE BECAUSE A REASONABLE JURY COULD FIND THAT PROGRESSIVE ACTED IN BAD FAITH UNDER THE TOTALITY OF THE CIRCUMSTANCES.

### A. Florida's bad-faith standard.

The Supreme Court of Florida recently summarized the insurance bad-faith standard in *Harvey v. GEICO General Insurance Co.*, 259 So. 3d 1 (Fla. 2018):

> Almost four decades ago, we explained the law of bad faith and the good faith duty insurers owe to their insureds in handling their claims, which still holds true today. *See Boston Old Colony* [*Ins. Co. v. Gutierrez*], 386 So. 2d [783,] 785 [(Fla. 1980)]. We explained that "in handling the defense of claims against its insured," the insurer "has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Id.* This duty arises from the nature of the insurer's role in handling the claim on the insured's behalf—because the insured "has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured." *Id.* We explained in great detail what this duty requires of insurers:
>
> > This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and

settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so. Because the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith.

*Id.* (citations omitted).

We reaffirmed this duty insurers owe to their insureds in *Berges* [*v. Infinity Insurance Co.*], stating that the insurer "owe[s] a fiduciary duty to act in [the insured's] best interests." 896 So. 2d [665,] 677 [(Fla. 2004)]. Indeed, "this is what the insured expects when paying premiums." *Id.* at 683.

The obligations set forth in *Boston Old Colony* are not a mere checklist. An insurer is not absolved of liability simply because it advises its insured of settlement opportunities, the probable outcome of the litigation, and the possibility of an excess judgment. Rather, the critical inquiry in a bad faith [action] is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment. "[T]he question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." *Id.* at 680. Further, it is for the jury to decide whether the insurer failed to "act in good faith with due regard for the interests of the insured." *Boston Old Colony*, 386 So. 2d at 785.

*Harvey*, 259 So. 3d at 6–7.

In this case, there were disputed material facts, and the district court improperly granted summary judgment.

**B. In its handling of the potential consortium claim, Progressive did not work on Consul's behalf to avoid an excess judgment.**

In Progressive's November 15 response to the October 7 letter, Progressive added a condition that was not in that letter: a release from Choisser's wife of any potential consortium claim. Progressive's actions reveal an inexplicable insistence on the release of the potential claim:

- At all times, Progressive knew that Posgay did not represent the wife.

- For some unknown reason, Forst interpreted "all claims" in Choisser's October 7 letter to include any potential consortium claim.

- Forst conducted a deficient investigation that led her to conclude that the wife's name was Mary and included that name in the proposed release— even though Choisser had divorced Mary in 2000 and was married to Dana Marie Merritt for several years.

- After his December 1 letter in which Posgay said he did not represent the wife, Forst did not revise the proposed release to omit the wife.

- Forst did not contact Posgay to correct the wording in the December 7 letter, which she finally realized was improper only on the eve of her deposition.

- In fact, Forst insisted that the release include the wife unless Posgay wrote Progressive a letter stating that he would not pursue a consortium claim on her behalf.

- In the December 13 letter, Posgay again stated that he did not represent the wife, and thus could not waive any claims on her behalf.

- Forst believed that it was Posgay and Choisser's obligation to ask the wife about any potential consortium claim. As this Court recently reiterated, however, "Bad faith 'is determined under the "totality of the circumstances" standard, and we focus "not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured."'" *Ilias v. USAA Gen. Indem. Co.*, 61 F.4th 1338, 1344 (11th Cir. 2023) (quoting *Am. Builders Ins. v. Southern-Owners Ins.*, 56 F.4th 938, 945 (11th Cir. 2023)); *see also Pelaez v. Gov't Employees Ins. Co.*, 13 F.4th 1243, 1254 (11th Cir. 2021) ("In a bad faith action there's a difference between ***focusing*** on a claimant's actions, which would be improper, and ***factoring*** a claimant's actions into the totality of the circumstances analysis, which is not improper." (emphasis in original)).

- Forst never attempted to contact the wife regarding a potential consortium claim, even though she had sent letters directly to claimants' spouses in the past.

- Had Forst done so, she would have learned that the wife had no interest in pursuing a consortium claim.

- Forst did virtually nothing for eleven months other than check the clerk's website to see if Plaintiff was sued.

For whatever reason, Progressive chose to insist that Posgay release a claim that was neither his nor his client's to release, even though it knew that Posgay did not represent the wife. *Cf. Eres v. Progressive Am. Ins. Co.*, 998 F.3d 1273 (11th Cir. 2021) (holding there was no bad faith when the insurer provided an overbroad proposed release but, when the claimant objected, it offered to strike the offending language). The district court attempted to distinguish *Eres* by saying that, in *Eres*, the insurance company offered to strike the offending language, and in this case, Progressive offered to modify language in the release but Posgay and Choisser did not take Progressive up on the offer. (DE 68 at 11–13.) But that would have been futile, because there is no indication at all that Progressive ever would have given up its insistence on the release of the potential consortium claim.

So this case fits squarely within the district court's acknowledgement that, as "[t]he Eleventh Circuit noted [in *Eres*], ... an overbroad release can create a factual dispute regarding bad faith." (*Id.* at 11 (citing *Eres*).) And contrary to the district court's conclusion, the release language covering the potential consortium claim was not "reasonable" (*id.* at 13), under the facts of this case, where Progressive knew Posgay did not represent the wife, and Progressive made no effort to contact the wife to address its concern about a potential consortium claim.

With regard to the potential consortium claim, Progressive did not "diligently, and with the same haste and precision as if it were in the insured's shoes, work[] on the insured's behalf to avoid an excess judgment." *Harvey*, 259 So. 3d at 7. The district court thus erroneously concluded that "no reasonable jury could find that Progressive acted in bad faith regarding the consortium claim." (DE 68 at 13.) Summary judgment was improper.

### C. In its handling of the property-damage claim, Progressive did not work on Consul's behalf to avoid an excess judgment.

The district court also erred when it concluded that Progressive's actions relating to the title to Choisser's car fell short of bad faith.

The main issue here is the applicability of Florida Statutes § 319.30. "Section 319.30 defines a vehicle which constitutes a 'total loss' as one when there is an agreement between the insurance company and the vehicle owner to replace the vehicle with one of like kind and quality." *McKinney v. Fortune Ins. Co.*, 949 So. 2d 225, 225 (Fla. 3d DCA 2006). Under § 319.30(3)(a)2., a car is not a "total loss" if the insurer and the owner agree to repair, even if the actual cost to repair exceeds 100% of the replacement cost. In that circumstance, there is no obligation on anyone to send the state the certificate of title, just on the owner to send a request to rebrand the certificate of title with "Total Loss Vehicle."

In the summary-judgment order, the court acknowledged that neither Posgay nor Choisser conceded that his car was a total loss. But the court said that

"Choisser and Posgay also never stated that Choisser wanted to repair the vehicle and never offered any evidence to Progressive of their valuation of the vehicle." (DE 68 at 14.) This is not an accurate view of the summary-judgment evidence. Posgay explicitly indicated in the December 13 letter that Choisser may want "to retain and repair the vehicle." (DE 33-13.) While Posgay did not provide Progressive pieces of paper supporting his valuation of the car, in his conversation with Dougherty, Posgay referred to the Kelley Blue Book and NADA guides. (DE 33-2 at 138.) Certainly, an insurance company could review those authorities and understand how a claimant used them to arrive at their valuation.

The district court also erred when it wrote that, "Even if Progressive was not legally required to take title under Florida law (about which the Court expresses no opinion), Progressive had a good faith interpretation of the law." (DE 68 at 15.) As prolix as § 319.30 is, Progressive obviously misunderstood the statute. Progressive is a sophisticated party, an insurance company; it is not reasonable to state that Progressive's misunderstanding of the statute was, nonetheless, a good-faith interpretation when that misunderstanding so conflicted with the statute's plain language. What is more, the Third District Court of Appeal had explained the statute's "total loss" definition in 2006 in *McKinney*. So even if § 319.30 could somehow have been misunderstood, such misunderstanding was no longer reasonable after

2006. "There is no adage older than that ignorance of the law excuses no one." *Davis v. Strople*, 29 So. 2d 364, 367 (Fla. 1947) (Buford, J., dissenting).

Under the only reasonable understanding of the statute, the summary-judgment evidence showed that Progressive was insisting in its counteroffer that Choisser do something that the law did not require him to do—something Progressive surely should have understood. That is evidence of bad faith that should have resulted in the denial of Progressive's summary-judgment motion.

**D. Other facts supporting a finding of bad faith.**

In addition to the facts surrounding the proposed release and the title to the car, there are other facts that would support a verdict that Progressive acted in bad faith:

- Based on evidence that Progressive did not send its insured, Consul, an excess letter, a reasonable jury could conclude that Progressive did not send such a letter. *See Boston Old Colony*, 386 So. 2d at 785 (an insurer must "warn [its insured] of the possibility of an excess judgment"). The district court erroneously weighed the evidence in reaching a different conclusion. (*See* DE 68 at 16–17.)

- After Posgay's December 13 letter, Progressive could have, but did not, call Posgay to clarify that it had not rejected his offer to settle the claims and was, in fact, still willing to settle.

36

- Campione told Forst on December 20 that he was worried Progressive was exposing Plaintiff's assets and mentioned bad faith, putting Progressive on notice that it could be acting in bad faith in its handling of the claims.

- After receiving the December 13 letter, Forst went to Mixson, they determined no response was required, and Progressive would just wait for a lawsuit.

- Progressive did not otherwise attempt to settle the claims after the letter, although Choisser did not file suit until November 2017—almost a year after Progressive's questionable determination that the claims would not settle. In that time period, there is contemporaneous evidence that Progressive thought the claims could still be settled but did absolutely nothing.

When the testimony and evidence is viewed in Consul's favor, they clearly establish that Progressive acted in bad faith. The totality of circumstances shows that Progressive did not "use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business," "with due regard for the interests of the insured." *Boston Old Colony*, 386 So. 2d at 785. In other words, the totality of circumstances shows that Progressive did not "diligently, and with the same haste and precision as if it were in the insured's shoes, work[] on [Consul's] behalf to avoid an excess judgment." *Harvey*, 259 So. 3d at 7.

While the evidence and fact testimony fully and independently support the above conclusion, it is confirmed by expert Hook's testimony, *see supra* at 22–24, which the district court did not refer to at all in the summary-judgment order.

Progressive's inexplicable action and inaction was sufficient evidence of bad faith to avoid summary judgment. And although it is not necessary to ask ***why*** Progressive behaved the way it did, it is worth noting that Progressive employees Wolfe and Forst certainly did not like Posgay. (DE 33-2 at 139; DE 36-1.) Perhaps Progressive simply did not want to act diligently, and with the requite haste and precision.

## POINT II

THE DISTRICT COURT ERRED WHEN IT
GRANTED SUMMARY JUDGMENT FOR
PROGRESSIVE BECAUSE A REASONABLE JURY
COULD FIND THAT PROGRESSIVE'S BAD FAITH
CAUSED THE EXCESS JUDGMENT TO BE
ENTERED AGAINST CONSUL.

As the Supreme Court of Florida wrote in *Harvey v. GEICO General Insurance Co.*, 259 So. 3d 1, 7 (Fla. 2018):

> The damages claimed by an insured in a bad faith case "must be caused by the insurer's bad faith." However, "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured."

(Citations omitted.) "In a bad faith action there's a difference between ***focusing*** on a claimant's actions, which would be improper, and ***factoring*** a claimant's actions into the totality of the circumstances analysis, which is not improper." *Pelaez v. Gov't Employees Ins. Co.*, 13 F.4th 1243 (11th Cir. 2021) (emphasis in original).

The district court concluded that Progressive's failure to engage in settlement negotiations after December 13, 2016, could not have caused the excess judgment because Progressive could not have settled within the policy limits after that date. (DE 68 at 19.) However, "[a]ny question about the possible outcome of a settlement effort should be resolved in favor of the insured; the insurer has the burden to show ... that there was no realistic possibility of settlement within policy

limits[.]" *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991) (citations omitted).

The district court's reasoning here was flawed. It wrote that "Posgay unequivocally testified that the case could not have been settled within Consul's policy limits after Posgay's December 13, 2016 letter declining Progressive's counteroffer[.]" (*Id.* at 18.) This reasoning failed to give appropriate weight to the other testimony and evidence in the case, and transgressed the rule stated in *Powell* about resolving questions in favor of the insured.

First, as the district court recognized, the December 13 letter did not unequivocally communicate to Progressive that settlement was off the table. (DE 68 at 17–18 ("Posgay's letter, while it made clear that Posgay was **unlikely** to consider any other settlement offers, did not contain nearly as unequivocal of a statement as the one in *Deary* [*v. Progressive Am. Ins. Co.*, No. 21-11878, 2022 WL 2916358 (11th Cir. July 25, 2022)].") (emphasis added).) The letter was open-ended and did not foreclose settlement; it said nothing about an intent to file a lawsuit. In its entirety, the letter indicated that all Progressive had to do was make an offer on the same terms offered by Posgay.

Second, Progressive's own claim notes show that Progressive understood that the claim could still settle. The district court did not address these notes.

Third, there is no testimony that Choisser would simply have done what his

attorney recommended. A medical doctor and an attorney, Choisser was a sophisti-cated client, reducing the persuasive force of Posgay's testimony. Also, though not contemporaneous evidence, Choisser testified in his deposition that he would have settled on his original terms.[2] (DE 38-1 at 81:4–10; DE 65.)

Against the above (mostly) contemporaneous evidence, we have Posgay's after-the-fact deposition testimony. Posgay's testimony and the contemporaneous evidence pointed in two different directions. The contemporaneous evidence indi-cated that the claims could have settled after December 13, 2016, whereas Posgay's after-the-fact deposition testimony indicated that they could not have. This was a genuine conflict that was for a jury, not the district court, to resolve. A reasonable jury could credit the contemporaneous evidence and discredit Posgay's deposition testimony. As a result, Progressive did not satisfy its "burden to show ...

---

[2] In response to this testimony, the district court said:

> Upon a full reading of Choisser's testimony, it is clear that this state-ment merely evidences Choisser's amenability to settlement on his terms as laid out in the October 17, 2016 demand letter. *See* (Doc. 38-1 at 79:19–81:10). Choisser's testimony, even considered in the light most favorable to Consul, does not lead to the inference that Choisser would have tried to settle the case on his own after his lawyer, Posgay, declined Progressive's counteroffer on December 13, 2016.

(DE 68 at 19–20 (footnote omitted).) The first sentence is, of course, true. But that is the point: There was nothing stopping Progressive from reconsidering its earlier position and making an offer to Choisser (through Posgay) on Choisser's original terms. Choisser's testimony is that he would have accepted that offer.

that there was no realistic possibility of settlement within policy limits[.]" *Powell*, 584 So. 2d at 14 (citations omitted). Accordingly, the district court erred when it concluded, "[a]s a matter of law, [that] Progressive's failure to continue settlement negotiations after December 13, 2016, did not cause the excess judgment." (DE 68 at 20.)

## **CONCLUSION**

For the above reasons, Consul asks the Court to vacate the Judgment in a Civil Case (DE 69) entered on the Order (DE 68) and remand for a jury trial of his bad-faith claim against Progressive.

# CERTIFICATE OF COMPLIANCE WITH RULE 32(g)

Appellant hereby certifies that the Initial Brief of Appellant complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(i). This brief contains 9,617 words.

By: _s/ Adam Richardson_____
ADAM RICHARDSON
Florida Bar No. 94886

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true copy of the foregoing was electronically

filed with this Court via CM/ECF, and was furnished to all counsel on the attached

service list, by email, on July 7, 2023.

> Waylon Thompson, Esq.
> MANUEL & THOMPSON, P.A.
> P.O. Box 1470
> Panama City, FL 32402
> Waylon@manuelthompson.com
> and
> BURLINGTON & ROCKENBACH, P.A.
> Courthouse Commons/Suite 350
> 444 West Railroad Avenue
> West Palm Beach, FL 33401
> (561) 721-0400
> Attorneys for Appellant
> pmb@FLAppellateLaw.com
> ajr@FLAppellateLaw.com
> kbt@FLAppellateLaw.com
>
> By: _s/ Philip M. Burlington_
> PHILIP M. BURLINGTON
> Florida Bar No. 285862
>
> By: _s/ Adam Richardson_
> ADAM RICHARDSON
> Florida Bar No. 94886

/kbt

## SERVICE LIST

**Joseph T. Kissane, Esq.**
COLE, SCOTT & KISSANE, P.A.
4190 Belfort Rd., Ste. 300
Jacksonville, FL 32216
joseph.kissane@csklegal.com
jessica.henson@csklegal.com
Counsel for Appellee